**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

A.B., a minor, by ANNIE D. BAEZ, his next
friend, parent and natural guardian,

                **Plaintiffs,**

-vs-                                              Case No.  6:05-cv-802-Orl-31KRS

SEMINOLE COUNTY SCHOOL BOARD
& KATHLEEN MARY GARRETT,

                **Defendants.**

## ORDER

In this case, the Plaintiff alleges that he was physically abused at school by one of his teachers, Kathleen Mary Garrett ("Garrett"), and thus he brings claims against both Garrett and the Seminole County School Board (the "Board") (collectively referred to with Garrett, where appropriate, as the "Defendants") under 42 U.S.C. section 1983 ("Section 1983") and section 504 of the Federal Rehabilitation Act, 29 U.S.C. section 701, *et seq.* ("Section 504" or the "Rehabilitation Act").  This matter is presently before the Court on Garrett's Motion to Dismiss (Doc. 12), and the Plaintiff's Response thereto (Doc. 24).

**I.    Background**

    A. Parties

    A.B. is a minor, and is represented here by Annie Baez, his next friend, parent

and natural guardian. A.B. is a resident of Seminole County, Florida. He is autistic,[1] and attends school as a special education student.

The Board is a governmental entity responsible for administering public schooling in Seminole County, Florida. Garrett was employed by the Board as an Exceptional Student Education ("ESE") teacher,[2] and was a resident of Seminole County, Florida.

B. Facts

A.B.'s allegations may be divided into two distinct time frames: the time prior to that during which Garrett was A.B.'s ESE teacher, and the time during which Garrett was A.B.'s ESE teacher.

*1) Prior to Garrett's position as A.B.'s ESE teacher*

The Board employed Garrett as an ESE teacher at Indian Trails Middle School ("ITMS") from 1992 through 2000. (Doc. 1 at 3). During that time, a variety of complaints were made against Garrett regarding her treatment of students, and these complaints reached a "critical point" in 1999. (*Id*. at 3-4). These complaints include: (1) parental complaints to school administrators regarding Garrett's verbal abuse of children during the 1996-1997 school year; (2) an August, 1999 accusation that Garrett choked a child around the neck and forcibly restrained him in a closet; (3) an August, 1999 accusation that Garrett slammed a child's head against a desk, and then

---

[1] Autism is a developmental disorder that is recognized and diagnosed by impairment of the ability to form normal social relationships, by impairment of the ability to communicate with others, and by stereotyped behavior patterns especially as exhibited by a preoccupation with repetitive activities of restricted focus rather than with flexible and imaginative ones. Medline Plus, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last modified February 4, 2003).

[2] The Board originally hired Garrett in 1978.

later entered that child's new class, confronted the child and called her a liar; (4) an accusation in the fall of 1999 that Garrett bit a child on the face, which incident was reported to school administrators; (5) an October, 1999 complaint lodged against Garrett regarding a child who had been left in class with soiled underwear, which condition resulted in sores and discomfort to the child; (6) a March, 2000 accusation that Garrett hit a child in the head with a meter stick; and (7) an assistant principal who recorded a statement which claimed that Garrett pushed a student into a door with such force that the child's glasses flew off. (*Id*. at 4).

A.B. alleges that the Board had knowledge of these incidents. (*Id*. at 3-4). For example, one parent, Carol Goings ("Goings") who had repeatedly complained about Garrett received a letter from the teacher's union threatening legal action against the parent if she continued to impugn Garrett's reputation. (*Id*. at 4-5). Goings showed the letter to the Board's administration. (*Id*. at 5). On September 10, 1999, Goings spoke with the ESE Zone Coordinator regarding Garrett's abuse of Goings' child, and on September 16, she sent a letter to ITMS regarding that abuse. (*Id*.). An assistant principal wrote a letter to Goings, stating that she did not have any evidence to substantiate Goings' allegations, and requested Goings' help in putting rumors about Garrett to rest. (*Id*.).

Despite the complaints, Garrett received a favorable performance review for the 1999-2000 school year from Eugene Petty ("Petty"), the principal at ITMS, which review did not mention the complaints. (*Id*.). The Director of Secondary Education, Ron Pinnell ("Pinnell"), however, noted that this review showed a lack of judgment in overlooking Garrett's problems and that the review should have included negative comments about Garrett. (*Id*. at 5-6). Pinnell also wrote that Garrett's "negative professional demeanor, poor communication skills and refusal to implement

the individual education plan of a special education student should have appeared in her evaluation . . . ." (*Id*. at 6). However, despite the complaints against Garrett, Pinnell created a new position for an ESE teacher at South Seminole Middle School ("SSMS"), and arranged to transfer Garrett to that position.[3] (*Id*.). Garrett was transferred to SSMS as an ESE teacher to begin the 2000-2001 school year.[4] (*Id*. at 7).

A.B. alleges that Garrett's transfer to SSMS was part of a practice the Board had of transferring teachers about whom there have been complaints and performance problems.[5] (*Id*. at 3). Rather than firing such a teacher, particularly a teacher qualified in an area in which there is a low supply of teachers (such as ESE teachers), A.B. alleges, the Board simply transferred such teachers instead of terminating, disciplining, supervising or monitoring them. (*Id*.).

*2) Garrett actions as A.B.'s ESE teacher*

A.B. was a student in Garrett's class during all or part of the 2002-2003, 2003-2004, and 2004-2005 school years, until the time that Garrett was suspended on October 25, 2004. (*Id*. at 7). During that time, although she was aware that A.B. was "easily emotionally abused and intimidated," Garrett subjected A.B. to the following acts: (1) slapping him on the head; (2) grabbing him by the neck and choking him; (3) yelling at and intimidating him when he was non-

---

[3] A.B. alleges that Garrett did not want to be transferred to this new position at SSMS. (Doc. 1 at 6, 7).

[4] A.B. alleges that prior to employing Garrett at SSMS, the Board had notice of allegations of abuse made against Garrett. (Doc. 1 at 11).

[5] A.B. also alleges that various school administrators, including principals, assistant principals, and the Director of Seminole County Middle Schools, engaged in a policy of "looking the other way" regarding student abuse at the hands of teachers. (Doc. 1 at 11).

compliant, although Garrett knew A.B. would potentially be harmed by such yelling; (4) placing A.B. in a closet and turning off the lights;[6] (5) striking him on the buttocks after he had wet his pants, resulting in a red mark; and (6) ridiculing and cursing at A.B. when he hit himself on the head with his hand,[7] saying "you stupid little ass . . . if you want to keep banging yourself on the head, then go ahead . . . because you deserve it." (*Id*. at 8-9, 13).

Garrett also engaged in a variety of other actions, which A.B. witnessed, including: (1) cursing at a child and pressing the child's face against his desk with one of the child's arms behind his back and his neck against the desk, so that the child's lips turned blue and his eyes bulged; (2) grabbing a child's thumb and bending it backwards while the child screamed in pain, resulting in the child's thumb becoming black and blue; (3) striking a child on the side of the face because the child was spinning a piece of string with his hand; (4) repeatedly flicking a child's earlobe with her fingernail such that the earlobe turned red, when she was not satisfied with the child's work; (5) using foul language in the children's presence; (6) while in the children's presence, engaging in conversations regarding her sexual activities, and displaying sexually explicit pictures of herself and others on her computer; (7) tightening a child's belt in a painful manner to prevent the child from putting his hands down his pants, and striking that child on the head when he did so; and (8) confining children to a bathroom as punishment, and forcing them to sit in the bathroom while other children used that bathroom. (*Id*. at 8-10). In response to one of her aides' suggestion that

---

[6] A.B. describes being placed in the closet as "torture." (Doc. 1 at 8).

[7] A.B. asserts that this behavior is representative of his disability. (Doc. 1 at 9).

the children might report these actions, Garrett stated, "none of these little shits will never (sic) go home and say anything." (*Id*. at 10).

Various employees at SSMS witnessed many of these acts. (*Id*. at 11). Several of Garrett's aides provided written reports and documentation of Garrett's actions, including print-outs of sexually explicit material from Garrett's computer, to Josephine Opisso ("Opisso"), an assistant principal at SSMS. (*Id*. at 12). These aides also provided to Opisso copies of false entries that Garrett would make in the children's student planners. (*Id*.). These false entries misrepresented the child's progress, omitted mention of Garrett's actions toward the child, and misrepresented the source of injuries Garrett had inflicted on the child. (*Id*.). Neither Opisso nor other SSMS administrators did anything upon receiving such information. (*Id*. at 13).

During the time Garrett was a teacher at SSMS, the Board had notice of allegations of abuse against her, yet did not do anything to prevent her from committing further acts against her students. (*Id*. at 11). Neither Garrett nor the Board reported such incidents to the children's parents, and actively concealed certain incidents from the parents. (*Id*. at 12).

Garrett was suspended on October 25, 2004, and was arrested on November 10, 2004. (*Id*. at 13). She was ultimately charged with multiple felony counts, including: (1) aggravated child abuse by willful torture or malicious punishment, related to placing A.B. in the closet; (2) child abuse, for hitting or battering a student (two counts); and (3) child abuse for bending a child's fingers backward.[8] (*Id*. at 13-14).

---

[8] Garrett was also charged with aggravated child abuse causing great bodily harm, stemming from an incident in December of 2001 in which she slammed a child's head against a desk with such force that the child's teeth were chipped. (Doc. 1 at 10). This incident had been reported to Opisso the same day it happened. (*Id*.).

C. Claims and Arguments

A.B. raises five claims against the Board and Garrett. In Count 1, against the Board, A.B. asserts a claim under Section 1983, alleging that the Board's conduct and failure to respond, despite its knowledge, to Garrett's misconduct exhibited deliberate indifference and caused a deprivation of A.B.'s Fourteenth Amendment right to be free from "unnecessary and unreasoanble force or intentional, reckless or deliberately indifferent or oppressive conduct that causes emotional or psychological harm." More specifically, A.B. alleges that the Board was deliberately indifferent to, permitted and tolerated Garrett's practice of unreasonable and inappropriate physical restraint and force against students, her intimidation of students, and her exposing students to sexually explicit comments and material, all of which A.B. alleges is atrocious and shocking to the conscience. In Count 2, against the Board, A.B. asserts a violation of Section 504 of the Rehabilitation Act, and claims that the Board discriminated against him based upon his disability by failing to protect him from exposure to Garrett's abuse.[9]

In Count 3, A.B. asserts a claim against Garrett under Section 1983 and alleges that Garrett's "physical and emotional abuse of her special needs students, including A.B., was shocking to the conscience, arbitrary and egregious and for the purpose of causing physical harm, pain, suffering and/or emotional or psychological trauma to A.B. in violation of and with deliberate indifference to" A.B.'s Fourteenth Amendment substantive due process rights. A.B. further alleges that, as a result of both witnessing and being subject to such abuse, he has suffered

---

[9] The Board previously filed a Motion to Dismiss (Doc. 13), which the Court denied. (Doc. 28).

physical, emotional and mental injuries, including intimidation, trauma and emotional distress.[10] In Count 4, A.B. brings a claim under Section 504 of the Rehabilitation Act against Garrett, asserting that she discriminated against him because she knew he was autistic yet failed to accommodate his condition when she exposed him to abuse.

Finally, in Count 5, A.B. brings a Section 1983 claim against the Board and Garrett, and alleges that the Defendants conspired to conceal the complaints of, and the facts relating to, Garrett's abuse of her students, in violation of A.B.'s constitutional rights.

Garrett has moved to dismiss the counts against her, arguing that: (1) the complaint fails to identify a particular injury; (2) she is immune from suit for actions in her official capacity; (3) the complaint does not state a claim under Section 1983 because it does not allege that Garrett's actions were excessive or involved unreasonable force resulting in injury to A.B.; (4) she is entitled to qualified immunity; (5) as an individual she is not subject to liability under the Rehabilitation Act; and (6) the complaint fails to state a claim for conspiracy by failing to allege an express agreement between Garrett and the Board and, in any event, that such a claim is barred by the intracorporate conspiracy doctrine.

## II.     Standard of Review

In ruling on a motion to dismiss, this Court must view the complaint in the light most favorable to the Plaintiff, *Cannon v. Macon County*, 1 F.3d 1558, 1565 (11th Cir. 1993), and must limit its consideration to the pleadings and any exhibits attached thereto. FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993). The Court will

---

[10] A.B. specifically alleges that he was "so severely affected" that "he would become very agitated." (Doc. 1 at 13).

liberally construe the complaint's allegations in the Plaintiff's favor, *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969), and will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), the rule to be applied is that, "courts must be mindful that the Federal Rules require only that the complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief." *U.S. v. Baxter Intern., Inc.*, 345 F.3d 866, 880 (11th Cir. 2003) (*citing* FED. R. CIV. P. 8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Id*. (internal citation and quotation omitted). "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." *Sams v. United Food and Comm'l Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir. 1989).

**III.     Legal Analysis**

A. Injury

Contrary to Garrett's assertions, A.B. has alleged that he suffered injuries as a result of Garrett's actions. Specifically, he alleged that he was subject to a variety of conduct which may collectively be termed "abuse": being slapped, struck, grabbed and choked, as well as being yelled at, intimidated, cursed at and ridiculed. A.B. also alleged that he witnessed a number of other abuses to which his classmates were subject at Garrett's hands.[11] Finally, A.B. alleged that as a direct result of Garrett's actions, he has suffered physical, emotional and mental injuries, including trauma and emotional distress, specifically, that he was so severely affected that he became very agitated. Thus, A.B. has sufficiently alleged that he has suffered injuries.[12]

B. Fourteenth Amendment Substantive Due Process

The Due Process Clause was intended to secure individuals from the arbitrary exercise of governmental power, and to prevent governmental power to be used for the purpose of oppression. *Daniels v. Williams*, 474 U.S. 327, 331 (1986). That clause protects:

---

[11] Neither party addressed the issue of whether A.B. can have suffered an injury such as emotional or psychological trauma simply by being exposed to Garrett's actions directed at other students (including violence, foul language and sexual impropriety), or whether A.B. can only have suffered recognized and actionable injuries as a result of Garrett's actions that directly impacted him. Accordingly, the Court will not address this issue here.

[12] In addition to physical injuries, it is clear that emotional and psychological injuries are actionable under Section 1983. *See Slicker v. Jackson*, 215 F.3d 1225, 1232 (11th Cir. 2000) (Section 1983 plaintiff may be awarded compensatory damages based on demonstrated mental and emotional distress); *H.C. by Hewett v. Jarrard*, 786 F. 2d 1080, 1088 (11th Cir. 1986) (emotional injury is actionable under Section 1983 for, *inter alia*, mental distress resulting from the deprivation of a constitutional right); *Stallworth v. Shuler*, 777 F.2d 1431, 1435 (11th Cir. 1985) (injuries in civil rights cases include damages for emotional distress).

> the right to be free of state intrusion into realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience of a court. The existence of this right to ultimate bodily security[,] the most fundamental aspect of personal privacy[,] is unmistakably established in our constitutional decisions as an attribute of the ordered liberty that is the concern of substantive due process.

*Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980) (recognizing right as applying to public school children under disciplinary control of public school teachers).

The Supreme Court has repeatedly emphasized that "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."[13] *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). Thus, the guarantee of due process does not result in an imposition of liability whenever a state actor causes harm; instead, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id*. at 848-49. Mere negligent conduct, therefore, does not reach the level of a constitutional violation. *Id*. at 849. Indeed, even intentional wrongs or conduct that amounts to an intentional tort under state law "will rise to the level of a substantive due process violation only if it also shocks the conscience."[14] *Waddell v. Hendry County Sheriff's Office*, 329

---

[13] This is particularly true in non-custodial settings. *See Nix v. Franklin County Sch. Dist.*, 311 F.3d 1373, 1377-78 (11th Cir. 2002); *White v. Lemacks*, 183 F.3d 1253, 1259 (11th Cir. 1999) ("[S]tate and local government officials violate the substantive due process rights of individuals not in custody only when those officials cause harm by engaging in conduct that is arbitrary, or conscience shocking, in a constitutional sense, and that standard is to be narrowly interpreted and applied.") (internal citation and quotation omitted).

[14] "Determinations of what is egregious conduct must not be made in the glow of hindsight; decisions made by a government actor must be egregious -- that is, shock the conscience -- at the time the government actor made the decision." *Waddell*, 329 F.3d at 1305 (original emphasis omitted).

F.3d 1300, 1305 (11th Cir. 2003); *see also Dacosta v. Nwachukwa*, 304 F.3d 1045, 1048 (11th Cir. 2002) (act defined as intentional tort under state law did not amount to deprivation of constitutional right). This "shocks the conscience" standard will have different meanings depending on a given case's factual circumstances. *Nix*, 311 F.3d at 1375.

Allegations of excessive corporal punishment can, in certain circumstances, assert a cause of action for violation of a student's rights under the Fourteenth Amendment Due Process Clause. *Neal v. Fulton County Bd. of Educ.*, 229 F.3d 1069, 1074 (11th Cir. 2000). However, "there can be no deprivation of substantive rights as long as disciplinary corporal punishment is within the limits of the common-law privilege to use reasonable force in disciplining children." *Id*. at 1074-75 (internal citation, quotation and punctuation omitted); *see also Hall*, 621 F.2d at 611 (corporal punishment is not a per se violation of public school student's substantive due process rights). In order to establish a claim that such punishment shocks the conscience, a plaintiff must, at a minimum, allege that a school official intentionally used force that was clearly excessive under the circumstances, and that the force presented a reasonably foreseeable risk of serious bodily injury. *Neal*, 229 F.3d at 1075. Such a claim thus has both an objective and a subjective component, both of which must be met: "[t]he punishment must objectively be obviously excessive and the [school official] must subjectively intend to use that obviously excessive amount of force in circumstances where it was foreseeable that serious bodily injury could result." *Id*. at 1075 n.3. To determine whether the force used was clearly excessive, courts consider the totality of the circumstances, and evaluate factors including: "(1) the need for the application of corporal punishment, (2) the

relationship between the need and amount of punishment administered, and (3) the extent of the injury inflicted."[15] *Id*. at 1075.

> Corporal punishment appears to be generally defined as involving
>
> what might be called traditional applications of physical force, such as where school officials, subject to an official policy or in a more formal disciplinary setting, mete out spankings or paddlings to a disruptive student.  Not all corporal punishment cases arise under those circumstances, however, and may involve less traditional more informally-administered, and more severe punishments.

*Neal*, 229 F.3d at 1072 (punishment where defendant was spurred to act by plaintiff's misconduct on school premises) (internal citations omitted).

In this case, A.B. makes several allegations that likely fall within the realm of "punishment," in the sense that it appears that Garrett's actions were in response to something that A.B. did at school, including: (1) yelling at and intimidating A.B. when he did not comply with Garrett; and (2) striking A.B. on his buttocks after he wet his pants.  Many of A.B.'s other allegations, however, based on the facts presented, defy classification, as "punishment," and instead appear more appropriately classified simply as abusive behavior, including: (1) "torturing" A.B. by placing him in a closet and turning off the closet light; (2) grabbing A.B. by the neck and choking him; (3) slapping A.B. on the head; and (4) ridiculing and cursing at A.B. when he exhibited behaviors representative of his disability.  In her Motion, Garrett relies heavily on cases

---

[15] Described another way, these factors include "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Neal*, 229 F.3d at 1076 (*citing Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973)).

whose analysis focuses on the physical results of corporal punishment.[16] These cases are not directly on point, however, as it appears that A.B.'s primary alleged injuries are those involving the emotional and psychological effects of Garrett's actions.

However, regardless of whether a claim is made under the rubric of "corporal punishment" or simply under "abuse," these claims are both brought under the Fourteenth Amendment Due Process Clause, and thus the "shocks the conscience" standard applies. *See Dacosta*, 304 F.3d at 1048 (applying "shocks the conscience" standard in case brought under Fourteenth Amendment where college instructor assaulted and battered student); *Nix*, 311 F.3d at 1375 ("As a general rule, to prevail on a claim of a substantive due-process violation, a plaintiff must prove that a defendant's conduct shocks the conscience.") (internal citation and quotation omitted).

---

[16] Garrett also strenuously argues that she did not commit any offense under Florida state law because she did not inflict any significant physical injuries upon A.B. (*See* Doc. 12 at 4-7). This argument is unavailing, however, because each statute she references clearly contemplates not just the infliction of physical injury, but mental and emotional injuries as well, something Garrett entirely neglects to address, and something that A.B. has clearly alleged he suffered as a result of Garrett's actions. *See* Fla. Stat. § 1006.11(2) ("Standards for use of reasonable force") (excusing teachers from liability for use of force *except* in cases of excessive force or cruel and unusual punishment); Fla. Stat. § 827.03(1) (defining "child abuse" as intentionally inflicting physical or mental injury on a child, or an intentional act that could reasonably be expected to result in such injury); Fla. Stat. § 827.03(2) (defining "aggravated child abuse" as, inter alia, willfully torturing, maliciously punishing, or wilfully and unlawfully caging a child); Fla. Stat. § 39.01(30) (defining "harm" to a child's health or welfare as inflicting physical, mental or emotional injury); Fla. Stat. § 39.01(43) (defining "mental injury" as "an injury to the intellectual or psychological capacity of a child as evidenced by a discernible and substantial impairment in the ability to function within the normal range of performance and behavior"). *See also Dufresne v. State*, 826 So. 2d 272, 278 (Fla. 2002) (statutory provisions in Florida Statutes chapters 39 and 827 are interrelated and should be read in proper relation to one another). Moreover, Garrett was charged with aggravated child abuse by willful torture or malicious punishment, which charge arose out of an incident involving her allegedly placing A.B. into a closet and turning off the lights, further belying her argument that she can only be liable for abuse when serious physical injury results.

In any event, it appears that the factors used to examine corporal punishment claims may be applied here to effectively examine A.B.'s abuse claims as well. *See Abeyta v. Chama Valley Indep. Sch. Dist., No. 19*, 77 F.3d 1253, 1257-58 (10th Cir. 1996) (stating that actions inflicting only psychological damage may shock the conscience, and applying that standard to case involving teacher's psychological abuse of student); *Brown v. Ramsey*, 121 F. Supp. 2d 911, 921 (E.D. Va. 2000) ("Nonphysical cases of harassment, or abuse, other than sexual abuse, have applied the same "shocks the conscience" standard."); *Fessler v. Giles County Bd. of Educ.*, 2005 WL 1868793 at *10 (M.D. Tenn. July 27, 2005) (in case where teacher kicked and threatened autistic student, noting that case was better characterized not as one involving corporal punishment but involving excessive force, but still applying same analytical framework); *Yap v. Oceanside Union Free Sch. Dist.*, 303 F. Supp. 2d 284, 297 (E.D.N.Y. 2004) (analyzing case involving lunch room monitor's racial and insulting comments directed at student under "shocks the conscience" standard).

The applicable law directs the Court to examine Garrett's conduct under several factors, including the need for the force used, the relationship between the need and the amount of punishment inflicted, and the resulting injury. In conducting this analysis, the Court is mindful of A.B.'s status as an autistic child.[17] Further, Garrett's actions must be considered in light of A.B.'s

---

[17] The Court has not found any law delineating the standard for the manner in which emotional and psychological injuries, particularly in the context of autistic, or otherwise emotionally handicapped children, are to be examined as part of the "shocks the conscience" analysis. However, the "shocks the conscience" standard in general, and the corporal punishment analysis in particular, both require a consideration of the factual circumstances in the case, and the Court would be remiss were it not to weigh A.B.'s condition as a significant fact. *See Dockery v. Barnett*, 167 F. Supp. 2d 597, 604 (S.D.N.Y. 2001) (noting that although injuries did not seem particularly serious, issue was one for a jury, especially considering that, *inter alia*, plaintiffs were "autistic children, who are more vulnerable and less capable of communicating than other children.").

allegation that Garrett was aware that he was particularly vulnerable to emotional abuse. Whether it was necessary for Garrett to act, physically or verbally, in the manner in which she did is clearly subject to dispute. Further, the fact that her actions are repeatedly characterized as abusive calls into question not only whether her actions were necessary, but also whether, even if they were necessary, they were excessive under the circumstances. Finally, A.B. alleges emotional and mental injury, including trauma and emotional distress, in that he was so severely affected by Garrett's actions that he became very agitated.[18] A.B. has clearly alleged facts supporting each element of the analytical framework, and it cannot be said, given the circumstances, that A.B. will be unable to prove that Garrett's actions are shocking to the conscience.[19] Therefore, the Court finds that A.B. has stated a claim for a constitutional violation.

C. Immunity

Garrett appears to argue that: (1) she is entitled to qualified immunity; and (2) under Florida Statute section 768.28(9), she cannot be liable for her actions because she was acting within the scope of her employment. However, she then specifically asserts that the Court cannot, at present, rule on the issue of qualified immunity because, she argues, A.B. has failed to plead a cause of action under Section 1983. (Doc. 12 at 10, 11-12). Further, Garrett argues that the issue of statutory immunity cannot be considered by the Court because A.B. has not sufficiently alleged

---

[18] Many courts also examine whether the force used was used in good faith or maliciously for the purpose of causing harm. *See P.B. v. Koch*, 96 F.3d 1298, 1304 (9th Cir. 1996); *Metzger v. Osbeck*, 841 F.2d 518, 520 (3rd Cir. 1988); *Garcia v. Miera*, 817 F.2d 650, 655 (10th Cir. 1987); *Hall*, 621 F.2d at 613. Here, it can readily be inferred from A.B.'s allegations that many, if not all, of the acts attributed to Garrett were not done in good faith.

[19] Even absent an analytical framework such as that required for corporal punishment, and simply viewing Garrett's actions in the abstract, the Court would arrive at the same conclusion.

the manner in which he was abused or the injury he suffered as a result. (*Id*. at 10). Accordingly, the Court will not address these issues at this time.[20]

D. Section 504 of the Rehabilitation Act

In Count 4, A.B. asserts that Garrett discriminated against him under Section 504 because she knew he was autistic yet still exposed him to abuse, thereby failing to accommodate his condition. In response, Garrett argues that as an individual, she is not subject to liability under the Rehabilitation Act. Garrett's argument in this regard is well-made. A variety of courts have indicated that an individual employee is not subject to individual liability under the Rehabilitation Act. *See Hiler v. Brown*, 177 F.3d 542, 547 (6th Cir. 1999) (individuals who do not meet statutory definition of employer are not liable under anti-retaliation provision of Rehabilitation Act); *Deptford Township School District v. H.B.*, 2005 WL 1400752 at *10 (D.N.J. June 15, 2005) (entities, not individuals, may be liable under anti-discrimination provision of Section 504); *Swaim v. Westchester Academy, Inc.*, 170 F. Supp. 2d 580, 583 (M.D.N.C. 2001) (individual supervisor not personally liable for retaliation under Rehabilitation Act); *Fitzpatrick v. Pa. Dept. of Transp.*, 40 F. Supp. 2d 631, 638 (E.D. Pa. 1999) (Rehabilitation Act does not provide for individual liability); *Farrell v. U.S. Dept. of Justice*, 910 F. Supp. 615, 618-19 (M.D. Fla. 1995) (proper

---

[20] The Court notes, however, that Garrett's argument regarding statutory immunity under Florida law appears unsupportable. Florida Statute section 768.28(9) provides for immunity for state actors "unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights [or] safety . . . ." F.S. § 768.28(9). A.B. has alleged that Garrett acted in an arbitrary and egregious manner, acted for the purpose of causing harm, pain, suffering and emotional or psychological harm, and acted with deliberate indifference to his rights. A.B. has also repeatedly labeled Garrett's actions as abusive. The clear inference from such allegations is that Garrett acted in bad faith, with malicious purpose, and with a willful and wanton disregard of A.B's rights and safety, and thus the Court is skeptical as to whether Garrett may be entitled to statutory immunity under Florida law.

defendant in claim of discrimination under Rehabilitation Act is head of agency accused of discriminating against plaintiff, and other individual defendants should be dismissed). Furthermore, the Eleventh Circuit has indicated that claims under the Rehabilitation Act are to be evaluated under the same standards as claims under the Americans with Disabilities Act ("ADA"), *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 n.3 (11th Cir. 2001), and the Eleventh Circuit has held that, in the same way as Title VII and the Age Discrimination in Employment Act, the ADA "does not provide for individual liability, only for employer liability." *Mason v. Stallings*, 82 F.3d 1007, 1008 (11th Cir. 1996).[21]  Therefore, because Count 4 assserts a claim under Section 504 against Garrett in her individual capacity,[22] that claim will be dismissed.

   E. Count 5 - "Section 1983 Conspiracy to Conceal Facts"

   In this Count, A.B. alleges that Garrett and the Board conspired to conceal facts related to the complaints about Garrett's actions, as well as about those actions themselves.  In response, Garrett asserts that the intracorporate conspiracy doctrine bars this claim.

   As the Eleventh Circuit has stated,

   The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in

---

[21] *See also Miller v. King*, 384 F.3d 1248, 1276 (11th Cir. 2004) (individuals are not subject to personal liability for violations of the ADA or Title VII); *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000) (individual employees are not liable under Title VII); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (proper defendants in Title VII action are employer or supervisory employees as agents of the employer).

[22] In paragraph 61 of the Complaint, A.B. realleges and incorporates by reference paragraphs 1 through 49.  (Doc. 1 at 16).  In paragraph 10, A.B. specifically alleges that Garrett is sued in her individual capacity.  (*Id*. at 2-3).

>   the scope of their employment, cannot conspire among themselves. The doctrine is
>   based on the nature of a conspiracy and the legal conception of a corporation. It is
>   by now axiomatic that a conspiracy requires a meeting of the minds between two or
>   more persons to accomplish a common and unlawful plan. However, under basic
>   agency principles, the acts of a corporation's agents are considered to be those of a
>   single legal actor. Therefore, just as it is not legally possible for an individual
>   person to conspire with himself, it is not possible for a single legal entity consisting
>   of the corporation and its agents to conspire with itself.

*McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (internal citations omitted). "This doctrine has been applied not only to private corporations but also to public, government entities." *Dickerson v. Alachua County Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000). The Eleventh Circuit, and District Courts within this Circuit, have applied this doctrine to civil rights cases. *See Dickerson*, 200 F.3d at 770; *Denney v. City of Albany*, 247 F.3d 1172, 1191 (11th Cir. 2001); *Crocker v. City of Fairhope*, 2005 WL 1027248 at *5 (S.D. Ala. March 30, 2005); *Taylor v. Alabama*, 95 F. Supp. 2d 1297, 1318 (M.D. Ala. 2000).

Here, the only alleged conspirators are Garrett and the Board. A.B. has specifically alleged that Garrett was an employee of the Board, (*see* Doc. 1 at 2, 3), and that she acted within the scope of her employment, (*see id.* at 2). As an employee of the Board, under the intracorporate conspiracy doctrine, Garrett cannot have conspired with the Board. Therefore, Count 5 will be dismissed.[23]

**IV.   Conclusion**

A.B. has alleged that he has suffered injuries as a result of Garrett's actions, and has provided sufficient allegations for the Court to conclude that he has stated a claim against Garrett

---

[23] This conspiracy claim is also subject to dismissal because A.B. fails to allege the existence of any agreement between the Board and Garrett. A.B. makes only the conclusory allegations that the Defendants actively concealed or conspired to conceal facts. Such conclusory allegations, unsupported by any factual allegations, are insufficient.

for actions that shock the conscience. Therefore, Garrett's Motion to Dismiss Count 3 will be denied. However, because Garrett is not subject to individual liability under the Rehabilitation Act, and because the intracorporate conspiracy doctrine bars A.B.'s conspiracy claim, Counts 4 and 5 will be dismissed. Accordingly, it is

**ORDERED THAT** Garrett's Motion to Dismiss (Doc. 12) is GRANTED as to Counts 4 and 5, and DENIED in all other respects.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 31, 2005.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party